151330 Copia Communications v. AMResorts, LP Mr. Giardano. Good morning. If possible, I'd like to be able to reserve a minute for rebuttal. One minute? Yes. Yes, you may. That would be fine. Your Honors, I'm here this morning on appeal from a decision of the District Court with respect to the dismissal of Mike High's case based upon a decision that there was a lack of personal jurisdiction. We respectfully submit that this decision, given the evidence, given the submissions that were filed before the District Court, was an error. And contrary to this Court's decision in the Downer case, which was decided last November by this Court, and then a recent decision by this Court, Cosart v. UnitedXL, the personal jurisdiction in this case relates to specific jurisdiction. And as the panel obviously knows, it is a three-part test and arising out of a breach of contract, an alleged breach of contract. With the three-part test, we are required as the plaintiff to demonstrate relatedness, purposeful availment, and then that the exercise of jurisdiction is reasonable for the minimum contact standard. We have, in this case, the circumstance of a contract between my client, Copia Communications, and a Jamaican company, Seawind, with what we allege is an alter ego, AM Resorts. And the contract itself, when considering a breach of contract, the Court is expected to look at a variety of different factors, including the formation of the contract, which the District Court examined carefully and looked and found that the contract was formed in Jamaica. But the Court glossed over what was a critical aspect of it, which was also the breach of contract. The Court also, when it looked below, did not focus so much upon the terms of the contract and the actual course of dealings. And I suggest when you look at this contract, particularly in light of the Downer case and then the Cosart case, you have a four, almost five-year duration of dealings between these parties. And I submit to you that in terms of trying to make a determination of whether or not there is future, there is contemplated future consequences, you follow the money. And the money in this case, under the terms of the contract, was delivered by U.S. mail each and every month to Massachusetts. But this contract, by your own admission, was formed in Jamaica. Well, the negotiations, it was signed in Jamaica. Yes, it was formed in Jamaica. Yes. No representative of the defendants with respect to this contract was ever physically present in Massachusetts. The record, as I read it, indicates that the contract was performed in Jamaica, or at least performed largely. It was for the installation of software and systems at two Jamaican hotels. Your client established an office in Jamaica. Well, performance was certainly largely in Jamaica, wasn't it? Actually, it's not. And if you look at the contract, Your Honor, the solutions that are defined under Section 2 of the contract, the solutions are defined as products. Yeah. And products, because this is a installation of equipment case. Look at the terms and the definition on, if you look at the terms of the contract, exhibit 2. Let's go no further than that. Installation of equipment, the equipment in question was installed in Jamaica. Yes, but it was shipped and paid for out of Massachusetts. So my client Wait a minute. Shipped and paid for out of Massachusetts? Well, the payment came into Massachusetts, but it was shipped by my client from Massachusetts to Jamaica. But that was your client's choice. There was nothing in the contract that required your client to ship it from Massachusetts. There is a clear expectation in the contract where it suggests that there are U.S. export controls under Section 9. That's true, but U.S. export controls doesn't mean Massachusetts. There is only one location of my client, which is the Commonwealth of Massachusetts. And so to suggest that it might be shipping product from Arizona or California is trying to read something that's really not in the terms of the contract. The contract specifically identifies my client as in the Commonwealth of Massachusetts at its principal place of business. Notice requirements are to be sent at the address under Section 18 that is identified on the first page, where there is an export control provision. And it says that the defendant shall comply with the all U.S. statutes, regulations, and laws. They are clearly referring to something that is equipment coming out of Jamaica being shipped into the country. And the only place logically is Massachusetts. So if a company from Oregon gives me a call this afternoon and says, we'd like to sell you something and we're going to manufacture it in Oregon and ship it to you in Maine, and I say, okay, it's a contract and I sign it with them and they ship it to Maine and I install it in my house, I suddenly submit to personal jurisdiction? Not necessarily, because that may go to whether or not it's a random or attenuated circumstance. Suppose it's a magazine that they ship to me for four years, they ship to me every week. If you ship for four years to me in Maine from Oregon, there is an expectation of clearly and you have a contract of a four-year duration. It is expected, there is voluntariness and foreseeability. So they can hail me into a court in Oregon. Exactly. So any magazine manufacturer in this country, seller in this country, can bring any of its customers into their home state? In the personal jurisdiction analysis, I think this Court has found specifically in the Downer case and then again in COSART, that physical presence is no longer a requirement, particularly in light of modern commercial activity, which is typically done by wire, telephone, e-mail, and electronic. How about you, Keith, go ahead. I was going to say, you know, it really isn't, it begs the question to say physical presence isn't required, because in both Downer and COSART, there were pervasive, repeated contacts with Massachusetts. Indeed, the contacts from Canada into Massachusetts in Downer were the essence of the formation of the contract. Candidates were sent into, you know, there was a hub of constant activity in Massachusetts concerning the contract. Somewhat the same thing in COSART. Nothing like that here. Nothing that you could have shipped the equipment to fulfill the contract from any way you wanted. There was nothing that required your client to manufacture it himself. It could have been manufactured by Hewlett Packard or IBM and shipped from some third state. That was of no interest, presumably, according to the contract, to the hotels. It is clearly of interest because this is not a services contract, although it has a services component. It is a products contract. If you look at the terms, there is an anticipation, and I submit to you it's actually more frequent than Downer in terms of the contacts with Massachusetts. Each and every month, a check was put in the mail from the defendants to Massachusetts. In Downer, there were three payments, milestone payments of $20,000. In this case, you have hundreds of thousands of dollars over a longer term than you had in the Downer case. In COSART, there was no consummation. But the three payments in Downer were, I mean, you've got the tail wagging the dog. Yes, they were mentioned by the court in Downer, but that wasn't the reason they found jurisdiction. Here, you've got this stream of payments, but you've got virtually nothing else. You have the products, you have products being upgraded, you have a termination, and in the decision for Downer, it says specifically, breach of the contract is enough. You have a notice which, reading the notice, I submit to you, look carefully at the exhibit where it says, we expect to contact you next time you come down to the island. They know that Mr. Waymire, who is the principal of COPIA, is in Massachusetts. He had just shipped, two months before, $266,000 worth of equipment. Then there's a termination. The termination note specifically says, we know that we owe you compensation under Section 14, and therefore, they never make payment. If there's any further questions, I'll submit them later on. Thank you. Thanks. Mr. Pirazzolo. Good morning. May it please the Court, Jack Pirazzolo on behalf of AMRESORTS, and with me is Michelle Hartman, also on behalf of AMRESORTS, and Brett Carroll will be speaking on behalf of SeaWind shortly. I want to go directly, Judge Thalia, first to your point about what this contract was about. It was a contract in which certain equipment was sent to Jamaica, but also there were services performed to Jamaica. If you look at the contract under the definition of solutions, which was the definition of what was going to occur under the contract, it was for ongoing provision of Internet services in Jamaica. The center of gravity, as Judge Sorokin properly recognized, of this contract was Jamaica at all times. Judge Kayada, with respect to the question you asked about the magazine being shipped to you, the point here, I think the central point, the central teaching of the specific jurisdiction analysis is to analyze what did the defendant do that was of consequence in the forum state. Your receipt of magazines from Oregon is of utterly no consequence to the contract you've entered. The fact that it was shipped from Oregon is of no consequence. The same is exactly true right here. The equipment, where the equipment came from, which by the way was never specified in the contract at all, where it came from was of utterly no consequence to either SeaWind or AMRESORTS. AMRESORTS wasn't even a signatory to the agreement. It was not even a part of the contract, so it's clearly of no consequence to AMRESORTS, but also of no consequence to SeaWind. I want to make a detail, I want to just point out a detail about the contract that seems to have gotten a little bit lost in the briefing, which is that there's this assertion that the contract itself is, says that notice must be provided to the Massachusetts address. If you actually read the contract and you read the provision, which is 18.3, it's on page 59 of the Japan appendix, you will see that actually the language is not so clear about that. You will see that the language says that the operative address is the one that's above, and if you look at the contract and you look at the language above, you will see that there's a reference to it as a Jamaica corporation, excuse me, a Massachusetts corporation with Jamaica offices at, which is unspecified. If you look at the invoices that were originally given, which is in the appendix at page, if you look at the appendix at pages 112 and I think 134, 137, and 145, you'll see invoices that are coming from a Jamaica address on behalf of COPIA. This is at all times a Jamaica, a Jamaican event. With respect to downer, obviously there have been trips. There were trips into Massachusetts. The bulk of the contract was performed in Boston by the investment bank and downer. And COSAR, obviously under the facts of that case, the defendant actually opened up, got a license to open up a sales office in Massachusetts for sales in Massachusetts. Both cases are clearly distinguishable from this one. I think that unless there are additional questions. Oh, with respect to the actual payment point, I'd like to make a point. I think that runs into Judge Salia's discussion in the Phillips-Exeter case and the discussions Judge Lynch in the Phillips case where while payment might be relevant, it does not in any way carry the day. And it clearly shouldn't carry the day here because all decisions related to this contract that matter for purposes of the claims that are being asserted in this case occurred in Jamaica. Let me ask about the COSAR precedent. Do you think it now requires the appellate court to address the statutory question first, or are we still free to address the constitutional question first if it will eliminate the statutory question? Well, it's going to be, as a threshold, it's going to be a question of Massachusetts law initially. That's the way that because it's a diversity case. And actually one of the things that did strike me about the COSAR case is that unlike a lot of the other precedents which really just jump straight to the constitutional question, this suggests that there was, in fact, a threshold requirement to really take time to analyze the statute. And I think there's language that says it actually may not be as extensive as some other state. But you haven't argued that in your brief. No, we did not. We went straight to the constitutional issue. For purposes of this case, both parties are assuming that Massachusetts jurisdiction is coextensive with the Constitution. We are. We are. I will note that the Lyle case, which is cited in the briefs, does analyze the jurisdictional issue along the lines of the Massachusetts statute. And in terms of consistency, it does make clear in that, and it cites a series of mass cases in the First Circuit cases that say that the payments into the jurisdiction are not sufficient, at least under the long-arm statute. I see that my time is almost up, unless there are any particular questions. If you're caught by surprise by your opponent in his remaining time, we'll give you a chance to respond. Thank you. Mr. Carroll. May it please the Court, my name is Brett Carroll on behalf of the appellee, Seawind. The arguments made by Mr. Perizzolo also apply equally to Seawind. In addition, I'd like to raise two brief points. First, affirming Judge Sorokin's opinion does not establish a precedent opening the floodgates for foreign defendants to avoid jurisdiction in the Commonwealth under the right circumstances, and it also doesn't leave, importantly, Copia without relief here. And second, there is an additional basis to affirm dismissal relative to Seawind based upon foreign nonconvenience. As to the first argument... Why don't you spend your time on jurisdiction? Yes, Your Honor. As to the first argument, I believe this Court in Downer, Phillips v. Prairie, Harlow v. Children's, and Lyle Richards all address services contracts, and this is a service contract. This is services relative to monitoring, maintaining Internet, so that when you're in your hotel room at this Jamaican resort and you can't go onto the Wi-Fi, you call up Copia right there. That's what this is all about. The only way Copia gets paid is through a revenue share with Seawind, such that the performance occurs exclusively in Jamaica, where if people use the Internet service, Copia gets the money and Seawind gets the money. All of the services are performed in Jamaica. And therefore, consistent with the Court's findings in those four cases, Downer, Phillips, Harlow, and Lyle, when Copia reached out to the foreign jurisdiction to initiate this contract to do the work and where the work was exclusively negotiated, executed, and fully performed in Jamaica, confirming jurisdiction here against it would be improper because the gravamen of the action all occurred in Jamaica, where the services occurred. And as I stated, Copia is not without relief here. This isn't a situation where you have a Massachusetts resident that has no connections at all to this foreign country. Copia has extensive business dealings in Jamaica. It has an office in Jamaica. The majority of its employees are in Jamaica. All of its work, regardless of Seawind, is occurring in Jamaica. And it is using Jamaican counsel there for other litigations. It's admitted that. This is not a situation where they're not without relief. We presented affidavit testimony in the fact that Jamaica is an adequate forum and that both Seawind and AmResorts Jamaica, not the AmResorts entity that's named here, are subject to service here. Copia has the relief, should it need and want to pursue that, where it determined that Jamaica law would apply based upon the contract that it executed. You said all of their employees are in Jamaica. Is this the only contract they have? Your Honor, we don't know the full extent. What we know is, based upon what's in the record, all of the employees that Copia has, other than Mr. Waymire, the principal, reside in Jamaica. Thank you, Your Honor. Thank you, Your Honor. I'm just going to respond in brief and come back to the focus for personal jurisdiction has to be not just on the formation of the contract. It also has to go to the course of dealings, the terms, the duration, and then we get to the breach. If you look at the terms, I'd like this Court to look at Section 2.1K, which is the definition of solutions. The definition of solutions is products. In Section 12, there is a provision on warranties. This is a service contract. We're not going to have express warranties, implied warranties of fitness for a particular purpose, et cetera. You have a long provision regarding warranties. Section 4, regarding the supply of solutions, and 4.2, the obligation of Copia to provide updated solutions. This is not something that was unforeseeable. They chose to have payments. They acknowledge payments went to the Massachusetts address each and every month. When you look at the circumstances of Downer and Cosart, this is clearly something that belongs in Massachusetts, and this Court should search jurisdiction. Thank you. Thank you very much. Mr. Perizzolo, do you want to add anything? No, Your Honor. No, Your Honor, but I just want to correct a cite that I gave to the Court. Do it by letter afterwards. Thank you both.